UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD McFEE, <br><br> Plaintiff, <br><br> v. <br><br> DIRECTOR BERHAN S. YEH, DR. L. LUND, FELICITAS FANDREYER, and STEPHEN SPAULDING, in their individual capacities, <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> )     CIVIL ACTION <br> )     NO. 18-11158-MPK <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS'**
**MOTION FOR SUMMARY JUDGMENT**

Brandon L. Bigelow (BBO# 651143)
Dallin R. Wilson (BBO# 676662)
SEYFARTH SHAW LLP
Seaport East, Suite 300
Two Seaport Lane
Boston, MA 02210
(617) 946-4800
bbigelow@seyfarth.com
drwilson@seyfarth.com

*Counsel for Richard McFee*

Plaintiff Richard McFee submits this opposition to Defendants Dr. L. Lund and Felicitas Fandreyer's Motion for Summary Judgment (ECF No. 142, the "Motion"). At its core, Defendants' Motion asks the Court should pass judgment on Mr. McFee's credibility and simply disbelieve him. Defendants even go as far as making several gratuitous references to Mr. McFee's mental health, implying that people diagnosed with those conditions are somehow less deserving of being believed. But the summary judgment standard applies equally to all parties, and once that proper standard is applied, the Court must conclude that there are many material disputed facts regarding whether Mr. McFee exhausted the administrative remedies that were available to him and whether the Defendants showed deliberate indifference to his serious medical conditions.

## ARGUMENT

### A. Summary Judgment Standard of Review.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To prevail on a motion for summary judgment, the moving party bears the burden of averring the absence of a genuine issue of material fact and "support[ing] that assertion by affidavits, admissions, or other materials of evidentiary quality." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). In determining whether summary judgment is proper, courts view the record in the light most favorable to the nonmoving party, and all reasonable inferences must be drawn in the nonmovant's favor. *Burns v. Johnson,* 829 F.3d 1, 8 (1st Cir. 2016). "At summary judgment, 'the judge's function is not himself [or herself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Chaney v. City of Framingham*, 2019 WL 6496842, at *4 (D. Mass. Dec. 3, 2019) (quoting *Anderson v Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## B. It is Disputed That Mr. McFee Failed to Exhaust the Administrative Remedies Available to Him.

Defendants move for summary judgment on the grounds that Mr. McFee failed to exhaust his administrative remedies prior to filing this lawsuit. Defendants' motion should be denied for two independent reasons. First, Defendants have failed to offer any admissible evidence to sustain their burden of showing that Mr. McFee failed to administratively exhaust his remedies before filing suit. The only evidence submitted by Defendants on this topic is inadmissible hearsay. Second, even if the Court considers Defendants' hearsay evidence, Mr. McFee's unrebutted, sworn testimony that he was thwarted from completing the BOP's grievance procedure creates a material disputed fact as to whether he exhausted the administrative remedies that were "available" to him.

### a. Defendants' "Evidence" is Inadmissible Hearsay.

Defendants contend that this Court lacks jurisdiction to consider Mr. McFee's claims because he failed to administratively exhaust them before bringing suit, as required by the Prison Litigation Reform Act ("PLRA"). Exhaustion under the PLRA is an affirmative defense, "thus placing the burden of showing non-exhaustion on the defendants." *Tolbert v. Clarke*, 685 F. Supp. 2d 244, 248 (D. Mass. 2010) (citing *Casanova v. Dubois*, 304 F.3d 75, 78 n. 3 (1st Cir. 2002)).

The only evidence submitted by Defendants to meet that burden is the declaration of Cheryl Magnusson, a legal assistant employed by the BOP. (ECF No. 106-1). Approximately 55 pages of computer screen shots that were purportedly taken from "SENTRY," the BOP's computerized database, are attached to the Magnusson Declaration. (*See id.* at ¶ 2). Ms. Magnusson declares that she has access to records regarding federal prisoners maintained in the ordinary course of business in the BOP, including, among others, records in the SENTRY database. (*Id.*) Ms. Magnusson then interprets the screenshots attached to her declaration to conclude that while in the custody of the BOP, Mr. McFee filed 99 requests for administrative remedy, including 17 while

incarcerated at FMC Devens, but that he did not exhaust any administrative remedies regarding his medical care at FMC Devens. (*Id.* at ¶¶ 8, 9, 13).

The Magnusson Declaration is inadmissible hearsay. "Hearsay evidence is inadmissible unless one of the exceptions to the hearsay rule applies, for '[i]t is black letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted.'" *Integrated Com's & Technologies, Inc v. Hewlett-Packard Financial Services Co.*, 478 F. Supp. 3d 126, 131 (D. Mass. 2020) (quoting *Geshke v. Crocs, Inc.*, 740 F.3d 74, 77 (1st Cir. 2014)).

Rule 803(6) of the Federal Rules of Evidence, better known as the business records exception, "authorizes the admission of certain documents under an exception to the usual prohibition against the admission of hearsay statements[.]" *U.S. Bank Tr., N.A. as Tr. for LSF9 Master Participation Tr. v. Jones*, 925 F.3d 534, 537 (1st Cir. 2019). Business records are not excluded under Rule 803(6) if: (1) the record was made at or near the time of the act or event recorded; (2) by—or from information transmitted by—someone with knowledge; (3) the record was kept in the course of a regularly conducted activity of business; (4) making the record was a regular practice of that activity; (5) all these conditions are shown by the testimony of the custodian or another qualified witness; and (6) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. It is the Defendants' burden, as the proponent of the evidence, to provide the foundational elements that show the SENTRY screenshots attached to the Magnusson Declaration qualify for the business record exception to the hearsay rule. *See U.S. v. Wecht*, 484 F.3d 194, 231 (3rd Cir. 2007).

Defendants have not met that burden. The only "evidence" Defendants could possibly rely on to establish the SENTRY records are business records is Ms. Magnusson's conclusory statement that she had "access to records regarding federal prisoners maintained in the ordinary

course of business in the BOP." (ECF. No. 106-1 at ¶ 2). Thus, *at most*, Defendants have satisfied only one of the criteria necessary for a document to qualify for the business record exception.

However, Defendants offer no evidence as to any of the other criteria. For example, there is no evidence as to *when* the SENTRY records were made, let alone that they were made at or near the time of the act or event recorded. *See Willco Kuwait (Trading) S.A.K. v. deSavary*, 843 F.2d 618, 628 (1st Cir. 1988) ("For a document to be admissible under Fed. R. Evid. 803(6) it has to be made 'at or near the time' of the events recorded."). Nor do Defendants offer any evidence about *who* created the SENTRY records, much less that they were created by someone with the requisite personal knowledge. *See Ira Green, Inc. v. Mil. Sales & Serv. Co.*, 775 F.3d 12, 20 (1st Cir. 2014) (document did not fall under business record hearsay exception where the record contained no evidence that the author of the record "had the requisite personal knowledge" of the events described in the document). The Magnusson Declaration also says nothing about whether it was a regular practice of the BOP's business to make the SENTRY records. And there is no evidence that Ms. Magnusson is qualified to explain the BOP's record-keeping procedure. *See Belber v. Lipson*, 905 F.2d 549, 552 (1st Cir. 1990) (testimony of the custodian or other qualified witness is "essential" to admission of a business record and without it, "the writing must be excluded."). Finally, Defendants have not demonstrated that the SENTRY records are trustworthy. *Ricciardi v. Children's Hosp. Med. Ctr.*, 811 F.2d 18, 23 (1st Cir. 1987) ("[A] record is not admissible under [Rule 803(6)] if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. An unknown source is hardly trustworthy.").

Courts have refused to consider the BOP's SENTRY records under similar circumstances. For example, in *Hicks v. Irvin*, the defendants moved for summary judgment, contending that the plaintiff failed to exhaust his administrative remedies as mandated by the PLRA before filing

*Bivens* claims. In support of their motion, the defendants submitted documents—nearly identical to those relied upon by Defendants here—from the BOP's SENTRY database and a declaration from a BOP attorney-advisor, which averred that for each of the 13 grievances the plaintiff filed with the BOP, he had not exhausted his administrative remedies. *Hicks*, 2010 WL 2723047, at *3 (N.D. Ill. July 8, 2010). The court disregarded the BOP attorney's declaration, holding that:

> Shaw's declaration and deposition do not set out the underlying facts upon which Shaw based his conclusion [that Hicks had not exhausted his administrative remedies with respect to the issues presented in the lawsuit] . . . . Equally important, Defendants have not offered the court a sufficient basis to consider Defendants' (possible) business records at summary judgment. For these reasons, Defendants' fact statements on exhaustion have been disregarded. *Id.*

*Hicks* is indistinguishable from this case. Defendants attempt to rely on the same type of deficient declaration from a member of the BOP legal staff that provides no basis for the Court to consider whether the SENTRY documents qualify for the business records hearsay exception. Accordingly, the Court should follow *Hicks* and disregard the Magnusson Declaration. And without any other admissible evidence to offer, Defendants have failed to meet their burden of proving their affirmative defense that Mr. McFee failed to exhaust his administrative remedies.

### b. Whether Administrative Remedies Were "Available" to Mr. McFee is a Disputed Fact.

Even if the Court were to consider the Magnusson Declaration, Defendants' motion should still be denied because whether administrative remedies were "available" to Mr. McFee is a question of fact that cannot be resolved in a motion for summary judgment. Defendants have offered no testimony to contradict Mr. McFee's sworn testimony that prison officials thwarted him from completing the BOP's administrative remedy procedure. Instead, they ask the Court to simply disbelieve him. But the Court is required to view the evidence in the light most favorable to Mr. McFee and therefore, at a minimum, Mr. McFee's sworn testimony creates a disputed fact.

### 1.    Inmates Need Not Exhaust Administrative Remedies if they Are Not "Available."

The PLRA provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner . . . until such administrative remedies *as are available* are exhausted."  42 U.S.C. § 1997(e)(a) (emphasis added).    The PLRA has a "built-in exception to the exhaustion requirement: A prisoner need not exhaust remedies if they are not 'available.'"  *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016).  Thus, "[u]nder the PLRA, a prisoner need exhaust only 'available' administrative remedies."  *Id*.

In *Ross*, the Supreme Court identified ways in which an administrative procedure may be "unavailable" to an inmate.  For example, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end— with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id.* at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id.*  And finally, an administrative procedure may not be available if "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id.* at 1860.

A "prisoner is deemed to have exhausted available administrative remedies" if "prison officials improperly fail to process [their] grievance," because "in such circumstances, prison officials have thwart[ed] inmates from taking advantage of [the] grievance process, making that process unavailable." *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016) (internal quotation marks omitted).[1]

---

[1] *See also Schultz v. Pugh*, 728 F.3d 619, 620 (7th Cir. 2013) ("A remedy is not available, therefore, to a prisoner prevented by threats or other intimidation by prison personnel from seeking an administrative remedy"); *Goebert v. Lee County*, 510 F.3d 1312, 1323 (11th Cir. 2007) (If a prison "play[s] hide-and-seek with administrative remedies," then they are not "available").

## 2. Mr. McFee Exhausted All Administrative Remedies That Were "Available" to Him.

Mr. McFee's unrebutted sworn testimony establishes that FMC Devens officials thwarted his efforts to exhaust his administrative remedies. Mr. McFee testified that in April and May of 2018 he attempted to file a grievance with FMC Devens. (SOF at ¶ 78). Because grievance forms are not available to inmates housed in the SHU, unit counselors are required to give the forms to inmates upon request. Mr. McFee requested those forms several times from his unit counselors, Messrs. O'Connor and Tidwell. (SOF at ¶ 79). At times, the unit counselors provided the forms to Mr. McFee, while at other times, he was forced to get them from other inmates because the counselors refused to give them to Mr. McFee because they claimed he "was putting in too much paper" *i.e.,* submitting, in their opinion, too many grievances. (SOF at ¶ 80).

Mr. McFee explained that FMC Devens would not process the forms that he was filing: "The unit team has to process the remedies through the computers for them to go through. If they are not processing them, I mean, what can I do?" (McFee Depo. at 54:13-18). Understandably, because Mr. McFee was incarcerated in segregation in the SHU, he had no control over what the prison staff did with the paperwork after he filed it. (SOF at ¶ 81). Defendants offer no testimony from Mr. McFee's unit counselors (or anyone else) to controvert his testimony.

## 3. Whether administrative remedies were "available" is a question of fact that cannot be decided in a motion for summary judgment.

Whether administrative remedies were "available" to Mr. McFee is a question of fact—and a disputed one at that. In adjudicating a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth of the matter. *Chaney v. City of Framingham*, at *4. Nevertheless, that is precisely what Defendants ask this Court to do.

But Mr. McFee's testimony is sufficient to create a disputed fact requiring denial of Defendants' motion. *Hicks* is once again instructive in this regard. There, the court agreed that the lack of SENTRY database records "proves nothing" about whether Hicks had exhausted his administrative remedies because "Hicks's declaration says that he did file grievance forms." *Hicks*, at *6. "Because he never received a receipt and there is no evidence that his complaint was filed within the BOP's system, then he could never have timely filed . . . appeals . . . with the regional director" and therefore, "under the regulations that the BOP wrote, an inmate never gains the right to appeal from a grievance that never gets filed, whether misplaced or ignored. *Id.* at *7.[2]

The same holds true here. The evidence submitted in support of Defendants' motion says nothing about whether Mr. McFee attempted to submit timely grievance forms but was thwarted by prison officials, either intentionally or negligently. Mr. McFee's testimony stands unrebutted.

Courts have concluded that summary judgement must be denied when faced with similar facts. For example, in *Williams v. Gore*, the plaintiff alleged that his Eighth Amendment rights were violated when he was denied medical care while incarcerated. 2017 WL 1354695, at *1 (S.D. Cal. Mar. 24, 2017). On his form complaint, the plaintiff checked a box that he exhausted all forms of administrative relief before filing suit, but admitted that "he was not able to fully exhaust the inmate administrative grievance procedure because 'there exist [*sic*] no viable exhaustion with the Medical Department when every verbal request for my leg surgery was ignored with a reply 'you must wait to be evaluated by our doctor.'" *Id.* The defendants moved for summary judgment on the grounds that the plaintiff had failed to exhaust his administrative remedies before filing suit.

---

[2] The *Hicks* court observed that "[p]erhaps these circumstances point to a glitch in the BOP's grievance procedure; if that is the case, it lies with the BOP's power to make a repair." *Id.* at *8.

The defendants provided evidence that the plaintiff was aware of the administrative grievance procedure because he had previously used it to address concerns about other issues. *Id.* at *2. The defendants offered testimony from prison officials that the plaintiff had never submitted a grievance regarding the failure to provide medical care. *Id.*

Reversing a magistrate judge's report and recommendation, the *Williams* court held that summary judgment was improper where there were "two competing sworn testimonies: Defendants' account that Plaintiff failed to exhaust and Plaintiff's account that he exhausted administrative remedies up until the point there was no 'available' procedure left." *Id.* at *7. The court found it "unpersuasive" that the plaintiff had "not provided copies of any of the grievances he submitted in the locked grievance boxes because the return of such copies is seemingly at the discretion of the deputies/guards—they only provide prisoners with a copy *at some point in time after* acknowledging receipt of the grievance." *Id.* (emphasis in original). "Thus, the existence of disputed material facts . . . raises issues of credibility and renders summary judgment improper." *Id. See also Kelly v. Peterson*, 2014 WL 3429596, at *2 (W.D. Wis. July 11, 2014) ("Although plaintiff relies solely on his own say-so as evidence that he never received a response [to his grievance], that is sufficient to create a genuine issue of material fact.").

As was the case in *Williams*, genuine issues of material fact exist as to whether the BOP's administrative remedy procedure was "available" to Mr. McFee. Defendants argue that no reasonable jury could possibly believe that Mr. McFee was prevented from submitting grievances or otherwise exhausting his administrative remedies "in light of the undisputed fact that McFee managed to file 99 administrative remedy requests during his BOP incarceration[.]" (Memo at 10). But previous success with filing past grievances does not mean that administrative remedies were available for the present issue. *See Turner v. Cash*, 2019 WL 1949458, at *4, *6 (C.D. Cal.

Jan 14, 2019) (denying summary judgment even where plaintiff was an "experienced user" of the administrative grievance system, because his previous successful filing of other grievances did not mean "prison officials did not thwart his efforts to file a grievance" for the incident at issue).[3] That Mr. McFee had *previously* filed (and prison officials accepted and processed) administrative remedy requests does not prove that he was not prevented from filing an administrative remedy related to *this particular* grievance against Dr. Lund and NP Fandreyer. Indeed, a jury could reasonably conclude that because Mr. McFee had previously filed a substantial number of grievances, prison officials may have become annoyed and irritated with him and simply stopped processing his paperwork. Ultimately, there remains a genuine question of material fact regarding whether such administrative remedies were "available" to Mr. McFee, which is an issue that cannot be resolved on a motion for summary judgment.

### C. Several Material Facts are in Dispute Regarding Whether Defendants Exhibited Deliberate Indifference to Mr. McFee's Serious Medical Needs.

Defendants also move for summary judgment as to whether Defendants exhibited deliberate indifference to Mr. McFee's serious medical needs. "Prison officials . . . violate the Eighth and Fourteenth Amendments' prohibition against 'cruel and unusual' punishments when they exhibit 'deliberate indifference' to a detainee's serious medical needs." *Perry v. Roy*, 782 F.3d 73, 78 (1st Cir. 2015). "Therefore, to prove an Eighth Amendment violation, a prisoner must satisfy both of two prongs: (1) an objective prong that requires proof of a serious medical need, and (2) a subjective prong that mandates a showing of prison administrators' deliberate indifference

---

[3] *See also Williams v. Paramo*, 775 F.3d 1182, 1192 (9th Cir. 2015) (argument that remedies were available to plaintiff because she was able to file multiple unrelated grievances and appeals is "a virtual non-sequitur because it does nothing to rebut [her] evidence that administrative remedies were not available to her at the time she tried to file the relevant grievance"); *Meredith v. Ada County Sheriff's Dept.*, 2014 WL 4793931, at 7 (D. Idaho Sept. 25, 2014) (fact that inmate filed other grievances was not dispositive of whether he was prevented from filing grievance regarding incident at issue).

to that need." *Kosilek v. Spencer*, 774 F.3d 63, 82 (1st Cir. 2014). The subjective prong requires

evidence that the failure to treat a serious medical issue was purposeful. *Kosilek*, 774 F.3d at 83.

The inmate must prove "that the charged official 'knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of the facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"

*Johnson v. Wright*, 412 F.3d 398, 403 (2nd Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825,

837 (1994)). "A state-of-mind issue such as the existence of deliberate indifference usually

presents a jury question." *Torraco v. Maloney*, 923 F.2d 231 (1st Cir. 1991).[4]

Defendants concede that Mr. McFee has serious medical needs, and therefore satisfies the

objective prong of the test. (Motion at 13).[5] Defendants nevertheless argue that because Mr.

McFee was extensively treated for his "medical needs," which resulted in the generation of over

10,000 pages of medical records during his incarceration (including while he was incarcerated at

---

[4] As set forth in Mr. McFee's statement of undisputed material facts, there are several bases on which a jury could reasonably conclude that Defendants harbored animosity towards Mr. McFee. On several occasions, Dr. Lund dismissed or otherwise expressed his skepticism of Mr. McFee's claims of discomfort. (SOF at ¶¶ 73-75). Even after Mr. McFee returned from the hospital due to Dr. Lund's failure to adequately treat his bleeding rectum, Dr. Lund still wrote that Mr. McFee's opinions about his health and care were "delusion[al]." (SOF at ¶ 76). And NP Fandreyer stated on multiple occasions that Mr. McFee would die soon. (SOF at ¶ 77). Thus, at a minimum there is a factual dispute about Defendants' states of mind.

[5] Defendants' specious argument that Mr. McFee's claims should be dismissed based on the doctrine of *res judicata* is appropriately relegated to a footnote in Defendants' brief. (Motion at 11, n. 3). Mr. McFee did not respond to the defendants' motion for summary judgment in the *Jordan* case, so it is not surprising that the court granted the motion. Moreover, for *res judicata* to apply, the causes of action and parties must be sufficiently identical in both cases. *See Andrews-Clarke v. Lucent Technologies, Inc.*, 157 F. Supp. 2d 93 (D. Mass. 2001). It is frivolous to suggest that Mr. McFee's claims in this case, which relate to a different medical condition and are asserted against entirely different defendants, are somehow identical to the claims in *Jordan*. Indeed, the sexual assault that caused Mr. McFee's injuries did not occur until *after* the *Jordan* case ended. Defendants do not advance their *res judicata* argument in good faith. They cite to the *Jordan* case in another transparent attempt (much like their references to his mental health diagnoses) to smear Mr. McFee and to try to persuade the Court that his testimony is unreliable.

other institutions), "[a] reasonable jury could not find that Defendants purposely failed to treat McFee's medical conditions, and McFee cannot satisfy the subjective test for deliberate indifference to his medical needs." (Motion at 14-16).

Conspicuously, Defendants' motion and statement of undisputed material facts are replete with references to Mr. McFee's generic "medical needs," but scarcely mention his persistent rectal bleeding and dangerously low magnesium levels—the two serious medical conditions that are the subject of this suit.[6] That Defendants may have treated *some* of Mr. McFee's medical issues does not make it undisputed that they did not exhibit deliberate indifference to *other* serious medical issues. And if Mr. McFee's medical records actually proved that Defendants provided significant treatment to Mr. McFee's bleeding rectum, then Defendants surely would have cited directly to them. Instead, they seek to distract from that central issue by pointing to all of the other treatment Mr. McFee received, to create the illusion that Defendants were attentive to the medical conditions relevant to this case. Defendants' need to resort to sleight of hand is telling.

In any event, courts routinely reject the type of "quantity over quality" argument that Defendants advance here. *See Miranda v. Munoz*, 770 F.2d 225, 259 (1st Cir. 1985) (the First Circuit has "declined to hold . . . that treatment received may never be so clearly inadequate as to amount to a refusal to provide essential care.").[7] And, as described in more detail below, there are

---

[6] In fact, the word "rectum" is *not mentioned* in Defendants' statement of undisputed facts and only used *once* in Defendants' 18-page memorandum of law (on page 1, reciting the allegations in the Third Amended Complaint). The word "magnesium" is only used *once* in Defendants' statement of undisputed facts and only *twice* in their memorandum of law, again when reciting Mr. McFee's allegations and once on page 4, where Defendants allege that Mr. McFee was noncompliant with his treatment for his magnesium levels.

[7] *See also Hathaway v. Coughlin*, 37 F.3d 63, 68 (2nd Cir. 1994) ("Nor does the fact that Foote frequently examined Hathaway necessarily vindicate Foote. The course of treatment Hathaway received clearly did not alleviate his suffering"); *Strain v. Regalado*, 977 F.3d 984, 994 (10th Cir. 2020) ("To be sure, whether Mr. Pratt received some care does not foreclose the possibility of a deliberate indifference claim").

at least three separate bases upon which a reasonable jury could conclude that Defendants exhibited deliberate indifference to Mr. McFee's serious medical conditions, each of which independently (and collectively) require Defendants' motion to be denied.

### a. A Jury Could Conclude that Defendants Exhibited Deliberate Indifference By Delaying Sending Mr. McFee to an Outside Hospital to Treat His Persistently Bleeding Rectum.

A reasonable jury could conclude that Defendants exhibited deliberate indifference when they refused to refer Mr. McFee to an outside hospital, despite repeatedly observing that he was suffering from rectal bleeding, yet doing nothing to stop it. Indeed, although Defendants noted Mr. McFee's rectal bleeding for several months, it was not until Mr. McFee was seen by an MLP covering for Ms. Fandreyer on a day she was away from the prison, that the decision was made to send Mr. McFee to the emergency room, where Mr. McFee finally had an external perirectal abscess incised and drained.

Mr. McFee suffered injuries to his rectum and anus after being sexually assaulted by two prison officials at a prior BOP facility. (SOF at ¶¶ 37-38). Dr. Lund and NP Fandreyer both were aware of the assault and both believed that it had occurred. (Lund Depo. at 27:3-28:5; Fandreyer Depo. at 52:4-8). Dr. Lund and NP Fandreyer both reviewed Mr. McFee's medical history (SOF at ¶¶ 9, 15), which showed that upon his arrival at FMC Devens, Mr. McFee reported that he had been sodomized at his previous institution and that he was experiencing rectal bleeding, irritation, and pain. (SOF at ¶ 39).

On April 5, 2018, shortly before his transfer to the SHU, Mr. McFee reported to another FMC Devens staff member that he was "bleeding from [his] butt" and that "[i]t hurts to sit down." (SOF at ¶ 40). After arriving in the SHU, Dr. Lund noted that Mr. McFee was complaining of anal pain and recurrent chest wall pain, but dismissed Mr. McFee's complaints as "somatic." (SOF at ¶ 74). NP Fandryer noted additional rectal bleeding on May 8, 2018 and that Mr. McFee reported

that the bleeding "has been going on since last fall." (SOF at ¶ 42). On May 11, 2018, NP Fandreyer again noted Mr. McFee's rectal bleeding (which "was verified by [fecal occult blood test]"), (SOF at ¶ 43) and that same day, Dr. Lund noted that Mr. McFee had "an active rectal lesion." (SOF at ¶ 44). Four days later, on May 15, 2018, Dr. Lund examined Mr. McFee and reported "dried bright red blood per rectum." (SOF at ¶ 45). Two days later, NP Fandreyer noted that Mr. McFee "reports that he had some rectal bleeding." (SOF at ¶ 48).

NP Fandreyer again noted that Mr. McFee reported that "he has had some rectal bleeding again" on July 12, 2018 and NP Fandreyer wrote that she would "discuss rectal bleeding with team MD." (SOF at ¶ 49). Additional rectal bleeding was noted by another nurse the next day, with the nurse reporting that Mr. McFee showed her "some tissue with bright red blood." The nurse wrote that "MLP [NP Fandreyer] is aware." (SOF at ¶ 50). Despite observing Mr. McFee's persistently bleeding rectum over the course of four months, Defendants did nothing to stop the bleeding or refer Mr. McFee to a medical provider that could help him.

Fortunately for Mr. McFee, he was examined on July 16, 2018 by Eduardo Pereira, an NP that was covering for NP Fandreyer while she was away from the prison. (SOF at ¶ 51). NP Pereira noted that Mr. McFee complained of "[bright red blood per rectum] x 3 months, which has worsened x 1.5 months and is 'gushing out.'" NP Pereira's note further reports that Mr. McFee complained of "pain in rectum due to skin being 'raw' and 'sometimes pus will come out.'" (*Id.*) NP Pereira's examination of Mr. McFee revealed that Mr. McFee had "some dry, red blood . . . on toilet paper he has placed there" and that the "area is painful to touch[.]" NP Pereira also saw that Mr. McFee's toilet was "full of paper towel with bright red blood [patient] reports came from anus." (SOF at ¶ 52). As a result of his examination, and obvious concern for the severity of Mr. McFee's condition, NP Pereira immediately sent Mr. McFee to the local emergency room to

receive potentially lifesaving medical attention.  (SOF at ¶ 53).  While at the emergency room, Mr. McFee had an external perirectal abscess incised and drained.  (SOF at ¶ 55).

Delayed treatment can form the basis of a deliberate indifference claim.  The Seventh Circuit reversed a grant of summary judgment, holding that a jury could have found that a prison's medical staff was deliberately indifferent by failing to treat an inmate's ulcers and refusing to refer him to a specialist, even where he exhibited symptoms such as severe heartburn and frequent vomiting.  *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005).  In *Greeno*, the defendants made many of the same arguments Defendants make here: that the plaintiff received ongoing medical treatment until his esophageal ulcer was discovered, and his claim was nothing more than a disagreement with a prescribed course of treatment.  *Id.*  The Seventh Circuit rejected those arguments, holding that "a factfinder could infer as much from the medical defendants' obdurate refusal to alter Greeno's course of treatment despite his repeated reports that the medication was not working and his condition was getting worse."  *Id.* at 654.  The court pointed to examples such as medical staff failing to respond to the inmate's requests to change his diet and medication and requests to see a specialist as evidence of deliberate indifference.  *Id.* at 654-55.  The court noted the possibility that the medical staff "did not do more for Greeno because they thought he was malingering and did not really have a severe medical need is an issue for the jury."  *Id.* at 655.[8]

Here, a reasonably jury could easily conclude that Defendants exhibited deliberate indifference by failing to treat Mr. McFee's bleeding rectum for four months, particularly where a different NP, upon first glance, considered Mr. McFee's condition to be so severe as to warrant a

---

[8]  *See also Machicote v. Roethlisberger*, 969 F.3d 822, 827 (7th Cir. 2020) (reversing summary judgment on the grounds that nurse's delay in providing pain medication could support inference of deliberate indifference); *Wilhelm v. Rotman*, 680 F.3d 1113, 1123 (9th Cir. 2012) (delay in treatment of plaintiff's diagnosed hernia due to doctor's refusal to make a referral for surgery could amount to deliberate indifference).

trip to the emergency room. Defendants' four-month delay in referring Mr. McFee to an outside hospital creates a disputed material fact for the jury to resolve.

      **b.**    **A Jury Could Conclude that Defendants Exhibited Deliberate Indifference By Approving the Cancellation of Mr. McFee's Wound Care Consult, Despite Observing Rectal Bleeding Immediately Before and After the Consult Was Cancelled.**

Similarly, a jury could also conclude that Defendants exhibited deliberate indifference to Mr. McFee's rectal bleeding when they approved the discontinuance of a wound care consult for Mr. McFee, despite knowing that he was still actively bleeding from his rectum. As detailed above, Mr. McFee complained of rectal bleeding immediately upon his arrival at FMC Devens and Dr. Lund and NP Fandreyer observed rectal bleeding when Mr. McFee was transferred to the SHU. (SOF at ¶¶ 39-43). At some point Mr. McFee was referred to a wound care specialist at FMC Devens to address the wounds near his rectum.

On May 11, 2018, Dr. Lund noted that Mr. McFee had "an active rectal lesion" (SOF at ¶ 44) and on May 15, 2018, Dr. Lund examined Mr. McFee and reported "dried bright red blood per rectum." (SOF at ¶ 45). Yet the next day, inexplicably, the wound care specialist discontinued the consult, writing that "at no time has he offered a complaint referenced in the initial consult" (*i.e.,* rectal bleeding), and that "it would appear the area has resolved as he has not offered any complaints." (SOF at ¶ 46). Despite observing just one day earlier that Mr. McFee had "dried bright red blood per rectum," Dr. Lund approved and cosigned the cancellation of the wound care consult. (SOF at ¶ 47).[9] Then, one day after the consult was cancelled, NP Fandreyer again noted that Mr. McFee "reports that he had some rectal bleeding." (SOF at ¶ 48).

---

[9] Dr. Lund could not recall whether he had any follow up conversations with Ms. Banfill after he saw that she was under the (mis)impression that Mr. McFee's rectal bleeding had resolved. (Lund Depo., 70:6-12). Mr. McFee's medical records reflect no such communication.

Once again, a reasonable jury could easily conclude that Defendants exhibited deliberate indifference to Mr. McFee's rectal bleeding by approving the cancellation of his wound care consult despite knowing that his wounds had not healed. There is nothing in the record demonstrating that Dr. Lund or NP Fandreyer attempted to correct the wound care specialist's misunderstanding that Mr. McFee's wounds had resolved. And Dr. Lund personally approved and cosigned the cancellation, despite observing rectal bleeding just one day earlier. This clearly creates a disputed material fact. *See Wilhelm*, 680 F.3d at 1123 (delay attributable to doctor's failure to request referral properly "and, more troublingly, his inexplicable cancellation of a second referral request" could prove deliberate indifference); *Leach v. Norris*, 34 Fed. Appx. 510, 511 (8th Cir. 2002) (inmate stated a claim for deliberate indifference by alleging the doctor cancelled a scheduled surgery and told inmate that he had to learn to live with the pain).

### c. A Jury Could Conclude that Defendants Exhibited Deliberate Indifference By Arbitrarily Refusing to Follow the Request of an Outside Hospital to Switch Mr. McFee's Magnesium Medication, Which Was Ineffective at Maintaining Safe Magnesium Levels.

In addition to exhibiting deliberate indifference to Mr. McFee's rectal bleeding, a jury could also conclude that Defendants exhibited deliberate indifference by arbitrarily refusing to switch Mr. McFee's magnesium medications, despite a request from an outside hospital that they do so, and despite knowing that the magnesium medication they had prescribed was ineffective at maintaining safe magnesium levels.

As a result of his multiple bowel surgeries, Mr. McFee's body does not effectively absorb magnesium. Mr. McFee therefore takes magnesium supplements to maintain healthy magnesium levels. When he first arrived at FMC Devens, Mr. McFee was prescribed a tablet form of magnesium medication. On April 6, 2018, after returning from the Nashoba Valley Medical Center ("Nashoba") emergency room, an FMC Devens registered nurse noted that the discharge

instructions from Nashoba stated "please consider switching [Mr. McFee] to liquid" magnesium. (SOF at ¶ 63). Dr. Lund admitted that liquid forms of magnesium were available through FMC Devens' pharmacy at that time and there was nothing that prevented him from switching Mr. McFee to liquid magnesium. (SOF at ¶ 64). Yet he did not follow Nashoba's recommendation.

On May 17, 2018, NP Fandreyer noted that Mr. McFee's labs showed low magnesium levels. (Def. Ex. A, GOV004802). On June 11, 2018, NP Fandreyer reported that Mr. McFee complained of chest pain for months and dizziness due to his low magnesium. Mr. McFee reported that he has dizziness when he gets up from a sitting position and that the magnesium pills he had been prescribed did not help his magnesium levels. (SOF at ¶ 66). Mr. McFee also requested "an IV of magnesium," but NP Fandreyer refused, instead chiding him and stating that "complaint oral therapy will prevent need for IV." (SOF at ¶ 67). Three days later, Mr. McFee reminded NP Fandreyer that Nashoba had recommended liquid magnesium. NP Fandreyer responded that Mr. McFee could just dissolve the magnesium gluconate tablets in water for the same effect. (SOF at ¶ 68). She was wrong.

On July 3, 2018, NP Fandreyer noted that, *despite being compliant with his magnesium medication*, Mr. McFee's magnesium levels "dropped from 1.4 to 1.0." Although NP Fandreyer had advised Mr. McFee less than one month earlier that his compliance with oral therapy would prevent the need for an IV, Ms. Fandreyer wrote "[c]onsider sending out for IV [magnesium]." (SOF at ¶ 70).

The magnesium medication prescribed by Defendants continued to be ineffective. On October 23, 2018, Dr. Lund noted that "[o]ral supplements of magnesium have not sufficed to restore or sustain magnesium levels, and [Mr. McFee] again requires IV magnesium." (SOF at ¶ 71). Then, on October 30, 2018–more than six months after Nashoba's recommendation—Dr.

Lund finally decided to "switch" Mr. McFee "to liquid [magnesium] supplement;" thereby confirming what Mr. McFee had been saying all along:  that liquid magnesium "worked better in the past."  (SOF at ¶ 72).

Continuing ineffective treatment while ignoring other medical providers' advice can amount to deliberate indifference.  For example, the Second Circuit reversed a motion for summary judgment that was entered in favor of prison officials who had refused to treat an inmate with a specific Hepatitis C drug that had been prescribed by his physicians, because they did not believe the treatment was permitted by certain prison guidelines.  *Johnson v. Wright*, 412 F.3d 398 (2nd Cir. 2005).  The trial court held that because the defendants reasonably believed that the guidelines were medically justified, the plaintiff necessarily could not prove that they acted with deliberate indifference.  *Id.* at 403-04.  Reversing, the Second Circuit held that even though a jury could conclude that the defendants had not acted in any way indifferent to the plaintiff's needs, a jury could also conclude that the defendants knew of, and disregarded an excessive risk to the plaintiff's health by refusing to provide the medication.  *Id.* at 404.  Specifically, the Second Circuit noted that "there is no evidence suggesting that the defendants took any step whatsoever to investigate— let alone verify—whether it would be medically appropriate to ignore the unanimous advice of [plaintiff's] treating physicians[.]"  *Id.*[10]

Likewise here, a jury could conclude that Defendants' arbitrary refusal, in the face of Nashboa's recommendation, to switch Mr. McFee to a more effective form of magnesium, despite knowing his prior medication was ineffective, exhibited deliberate indifference.  And this was not just an academic dispute over which medication was more effective; Mr. McFee's low magnesium

---

[10]  *See also Johnson v. Wright*, 234 F. Supp. 2d 352, 361 (S.D.N.Y. 2002) ("Prison officials may not 'substitute their judgments for a medical professional's prescription.'") (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000)).

levels caused him significant harm during the time Defendants kept him on the tablet form of medication. Around June 16, 2018, (five days after NP Fandreyer refused Mr. McFee's request for IV magnesium) Mr. McFee was sent to the hospital after he injured his head when he fainted due to low magnesium.[11] The hospital reported that Mr. McFee's magnesium level was 0.7. (SOF at ¶ 57). Dr. Lund testified that some of the symptoms associated with low magnesium levels were "muscle spasms, depression, low energy, various neurological sensations, paresthesia or kind of like a falling asleep of the limbs sort of feeling . . . . And if it it's very, very extreme you get some cardiac arrhythmias." (Lund Depo., 46:2-8). It is no coincidence that Mr. McFee suffered from many of these symptoms during six-plus months Defendants persisted in treated him with ineffective medication, in contravention of orders from an outside hospital.

## **CONCLUSION**

For the foregoing reasons, Mr. McFee respectfully requests that Defendants' motion for summary judgment be denied.

<div style="margin-left: 40%;">

Respectfully submitted,

**RICHARD MCFEE,**

By his attorneys,

*/s/ Dallin R. Wilson*
Brandon L. Bigelow (BBO# 651143)
Dallin R. Wilson (BBO# 676662)
SEYFARTH SHAW LLP
Seaport East, Suite 300
Two Seaport Lane
Boston, MA 02210
(617) 946-4800
bbigelow@seyfarth.com
drwilson@seyfarth.com

</div>

---

[11] Mr. McFee was also hospitalized after fainting around April 9, 2018, shortly before he was transferred to the SHU. (Def. Ex. A, GOV004912).

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 24, 2021.

*/s/ Dallin R. Wilson*
Dallin R. Wilson